**NORRIS, McLAUGHLIN, PA**
7 Time Square, 22nd Floor
New York, New York 10036
(212) 808-0700
Melissa A. Pena, Esq.
*Proposed Counsel to Major Model Management, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

.................................................................x

In re:

MAJOR MODEL MANAGEMENT, INC.,          Chapter 11
                                        Case No. 22-10169 (MG)
            Debtor.

.................................................................x

# DECLARATION OF GUIDO DOLCI IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Guido Dolci declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1. I am the President of Major Model Management, Inc. (the "Debtor"), the above-captioned debtor and debtor in possession in this Chapter 11 case. I have over thirty years of experience in the modeling industry. In my capacity as President, I have overseen the preparations of the Debtor's Chapter 11 filing. I am familiar with the day-to-day operations, business and financial affairs of the Debtor. As such, I have knowledge of the facts set forth herein based on my personal knowledge and/or my review of the Debtor's books and records, which are maintained in the ordinary course of its business.

2. I submit this Declaration pursuant to Local Rule 1007-2 and in support of the first day motions filed by the Debtor.

**Local Rule 1007-2 Representations**

**The Nature of the Debtor's Business and the Circumstances Giving Rise to the Chapter 11 Filing**

3.      In 1999, I formed the Debtor as a contemporary modeling agency to service the New York market. The agency has succeeded in developing strategic partnerships with its clients by placing models for media, television and film. Some of the Debtor's clients include Vogue, Harper's Bazar, Polo Ralph Lauren, Macy's, and Tom Ford.

4.      Commencing in early 2020, the Debtor became the subject of multiple lawsuits where models alleged that they were owed monies, including lawsuits where models sought class certification to assert claims that the Debtor violated the wage and hour provisions of the New York labor law and the Fair Labor Standards Act of 1938. While the Debtor successfully defeated 7 lawsuits, the approximate cost of such defense was in excess of $500,000 and harmed the business. On April 3, 2020, Jasmin Burgess ("Burgess") commenced an action in the United States District Court for the Southern District of New York entitled <u>Burgess v. Major Model Management, Inc., et al.</u>, Case No. 1:20-CIV-2816 against the Debtor (the "Federal Court Action"). Burgess brought the action in her individual capacity and as a representative of a class of similarly situated former models of the agency. In the Federal Court Action, plaintiff seeks to recover under the New York Labor Law 6 §§ 190 *et seq.*, allegedly unpaid wages, liquidated damages for wages purportedly paid late, repayment of deductions which are claimed to have been improperly charged to plaintiff, other statutory damages, disgorgement of funds received by the Debtor for services rendered by plaintiff and punitive damages. The crux of plaintiff's claim is that the Debtor improperly misclassified them as independent contractors. By way of the Federal Court Action, plaintiff seeks in excess of $5 million in damages. While the Debtor believes that it has a significant defense to the Federal Court Action, the costs associated with discovery, opposing class

2

certification and continued litigation of the matter is financially crippling to the business. Accordingly, the Debtor elected to seek the protections of the Bankruptcy Code.

**The Debtor's Assets, Liabilities, Creditors, Equity Interest Holders and Management Team**

5.    Annexed hereto as Exhibit A is a list of the holders of the twenty (20) largest unsecured creditors of the Debtor, which includes their name, address, telephone number, applicable account number and whether the Debtor disputes the claims.

6.    The Debtor has no secured creditors.

7.    The Debtor's assets consists of the following: (a) bank cash in the amount of approximately $180,000.00; (b) outstanding accounts receivables of approximately $484,334.91; (c) advances to models receivable in the amount of approximately $4,319.31; (d) loans to third parties in the amount of approximately $163,026.53; (e) prepaid corporate taxes in the amount of approximately $1,788.62; (f) security deposits in the amount of approximately $21,594.06; and (g) office equipment and furniture totaling approximately $25,454.06.

8.    The Debtor's liabilities consist of the following: (a) accounts payables to models and vendors totaling approximately $1,197,570.05; (b) a 1042 provisional reserve in the amount of approximately $35,000; and (c) Chase Bank credit line in the amount of approximately $68,129.51, which is disputed by the Debtor.  In addition to such liabilities, in the Federal Action, Burgess, individually and on behalf of all those similarly situated, seeks to recover approximately $5.4 million.

9.    The Debtor is wholly owned by Gemide SrL ("Gemide"), an Italian private company.  I own ninety (90%) percent of Gemide and my son, Mikel Guido Dolci, owns the remaining ten (10%) percent.

10.    The Debtor operates its business from the following two locations, which are leased by the Debtor: (a) 344 W. 38th Street, Suite 602, New York, New York 10018 (the "New York

Location"); and (b) 888 Newark Avenue, Suite 525, Jersey City, New Jersey 07306. In addition, the Debtor leases an apartment located at 7000 Kennedy Blvd. East, #34F, Guttenberg, NJ 07093 where certain models reside.

11. The Debtor's books and records and the majority of its assets are located in the New York Location. None of the Debtor's property is in possession of any custodian, public officer, or secured creditor.

12. There are no actions where a judgment against the Debtor or seizure of its property may be imminent.

13. The Debtor's existing senior management team, their tenure with the Debtor and a brief summary of their relevant responsibilities are as follows:

- Myself – I have worked in the modeling industry for over thirty years. I serve as the President of the Debtor. In such capacity, I am responsible for the overall long-term vision and planning of the Debtor. I am chiefly responsible for ensuring that both the Debtor and the Debtor's models are on the path toward success in the industry. I am also responsible for reviewing all of the financial information related to the Debtor, including approval of payments and charges. I have control of the Debtor's bank accounts. I also provide input and am involved in the hiring of upper level staff of the Debtor.

- Nadia Shahrik serves as the Vice President of the Debtor. Ms. Shahrik has worked in the modeling industry for over forty years. Prior to her employment with the Debtor, Ms. Shahrik owned her own modeling agencies. Ms. Shahrik has extensive experience as an agency owner, booking agent, and manager in both the modeling and fashion industries. In her capacity as Vice President of the Debtor, Ms. Shahrik oversees the Debtor's day-to-day operations. Ms. Shahrik is also responsible for executing all business plans envisioned by me. Ms. Shahrik is also chiefly responsible for managing model relationships, addressing any issues related to our models, interfacing with our models' clients, and overseeing accounting functions related to the Debtor.

**Post-Petition Operations**

14. Post-petition, the Debtor intends to continue to operate its business.

15. The estimated amount of weekly payroll for the Debtor's employees (excluding officers, directors, stockholders and partners) for the thirty (30) day period following the Chapter 11 filing is approximately $28,921.00.

4

16.     The amount proposed to be paid for the thirty (30) day period following the Chapter 11 filing for officers is $923.08, which is paid to Ms. Shahrik. Ms. Shahrik's company, MensBoard Management, Inc. also receives payments of $8,692 a month for consulting services rendered to the Debtor. I have never received a salary from the Debtor nor have I received any distributions from the Debtor.

17.     Annexed hereto as **Exhibit B** is a true and accurate copy of a schedule, for the thirty (30) day period following the filing of the Chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss. There are no receivables expected to accrue but remain unpaid.

18.     Local Rule 1007-2(a)(2) is not applicable because the Debtor's case was not originally commenced under Chapter 7 or Chapter 13.

19.     Local Rule 1007-2(a)(3) is not applicable because no committee was organized prior to the Petition Date.

**Evidentiary Support for First Day Motions**

20.     The Debtor has filed the following First Day Motions designed to facilitate its transition into this Chapter 11 case: (a) Motion of the Debtor for Entry of an Order Authorizing the Debtor to (I) Continue its Cash Management System, (II) Maintain Existing Bank Accounts, and (III) Receive a Waiver of Certain Operating Guidelines Relating to Bank Account ("Cash Management Motion") and (b) Debtor's Motion for an Order Authorizing the Debtor to Assume Certain Executory Contracts ("Motion to Assume").

      **The Cash Management Motion**

21.     Concerning the Cash Management Motion, the Debtor's cash management system is integral to the operation and administration of its business. The Cash Management System

5

allows the Debtor to (i) monitor and control all of the Debtor's cash receipts and disbursements, (ii) identify the cash requirements of the Debtor, and (iii) transfer cash as needed to respond to the obligations of the Debtor. The Cash Management System is managed by the Debtor at its headquarters in New York, New York. The Debtor's oversight ensures accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from its bank accounts. As of the Petition Date, in the ordinary course of the Debtor's business, the Debtor maintained a cash management system comprised of the following two (2) bank accounts, which are maintained with TD Bank, N.A.: (a) Account No. Ending In *2393; and (b) Account No. Ending In *2400 (jointly the "Bank Accounts"). All money flowing into the Debtor is collected in the Depository Account (*2393). Whenever a bill needs to be paid, or a model is owed money for his or her services, the potential charge is reviewed by me prior to being moved into the Disbursement Account (*2400). Once I have approved a charge as valid, the money to pay that charge is then transferred to the Disbursement Account. The money is then paid out from the Disbursement Account. The Debtor's clients directly deposit payment into the Depository Account. Should the Debtor be forced to establish a new system of accounts, the flow of money into Debtor's business, and out of Debtor's business, would be disrupted entirely. In order to ensure the continued smooth operation of Debtor's business, use of Debtor's current bank accounts would be ideal. In addition, as further set forth in the Cash Management Motion, the Debtor seeks to maintain its existing business forms.

**Motion to Assume**

22. Concerning the Motion to Assume, the Debtor contracts with models as independent contractors and is a party to Personal Management Agreements with its models. By way of this motion, the Debtor seeks to assume agreements with certain of its models as detailed on Exhibit C, which sets forth the name of the model and specifies the cure amount. Other than

the cure amount, the Debtor is not aware of any other claims by the models under the Modeling Contracts. Under the Modeling Contracts, the models engaged the Debtor as its sole and exclusive personal manager during the term of the agreement. The term of each of the Model Contracts is for a three (3) year period. Thereafter, it automatically renews for successive one (1) year terms unless terminated by either party by ninety (90) days written notice. The assumption of the Modeling Contracts is essential to the operation of the Debtor's business. The modeling agency business is extremely competitive business. Absent prompt payment under the Modeling Contracts, it is anticipated that the models will immediately terminate their contracts (notwithstanding the 90-day notice requirement set forth in the agreement) and cease working for the Debtor. Although the Debtor could exercise their rights under the Modeling Contracts, such a situation would be devastating to the continued operation of the Debtor's business. Absent assumption of the Modeling Contracts, the Debtor will be deprived of its most important asset, its models, at a time when the Debtor's ability to continue its operations is of critical importance. The models, who are counter parties to the Modeling Contracts, were specifically selected as their critical and valuable to the effective and efficient ongoing operations of the Debtor. Without the models, the Debtor's reorganization efforts will be placed in immediate peril, to the detriment of its creditors.

**WHEREFORE,** declarant requests that the Debtor shall be authorized to continue in operation and management of its business and affairs. I declare, pursuant to 28 U.S.C. § 1746, under the penalty of perjury that the foregoing is true and correct.

Dated: February 11, 2022                    */s/ Guido Dolci*
                                            Guido Dolci
                                            President